1
2
3
4

**NICHOLS KASTER, LLP**
Matthew C. Helland, CA Bar No. 250451
235 Montgomery Street, Ste. 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238
helland@nka.com

5
6
7
8
9
10
11

**NICHOLS KASTER, PLLP**
Brock J. Specht, MN Bar No. 0388343 (pro hac vice)
Cole A. Birkeland, MN Bar No. 0403499 (pro hac vice)
4700 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
bspecht@nka.com
cbirkeland@nka.com

12
13

ATTORNEYS FOR PLAINTIFFS AND THE
PROPOSED CLASS

14

*Additional Counsel on Following Page*

15
16

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO/OAKLAND DIVISION**

17
18
19
20
21
22
23
24
25
26

| | |
|---|---|
| Edmund Ang, Shayna DeMedici, and Carlyn Gaver, individually and as a representative of a class of similarly situated persons, and on behalf of the Franklin Templeton 401(k) Retirement Plan,<br><br>         Plaintiffs,<br><br>v.<br><br>Franklin Resources, Inc., the Franklin Templeton 401(k) Retirement Plan Investment Committee, the Franklin Templeton 401(k) Retirement Plan Committee, John and Jane Does 1-30, and Gallagher Fiduciary Advisors, LLC,<br><br>         Defendants. | **Case No. 3:25-cv-06130-VC**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND OTHER EQUITABLE RELIEF**<br><br>**(1) Breach of Fiduciary Duties under ERISA (29 U.S.C. § 1104)**<br><br>**(2) Failure to Monitor Fiduciaries**<br><br>DEMAND FOR JURY TRIAL |

27
28

1    **STEPHAN ZOURAS, LLC**
2    Ryan F. Stephan (pro hac vice)
     rstephan@stephanzouras.com
3    Catherine Mitchell Duffy (pro hac vice)
     cmitchell@stephanzouras.com
4    222 West Adams Street, Ste. 2020
     Chicago, Illinois 60606
5    Telephone:    (312) 233-1550

6    **DON BIVENS, PLLC**
     Don Bivens (pro hac vice)
7    don@donbivens.com
     15169 North Scottsdale Road 205
8    Scottsdale, Arizona 85254
     Telephone:    (602) 708-1450

9    ATTORNEYS FOR PLAINTIFFS AND THE
     PROPOSED CLASS

1

**NATURE OF THE ACTION**

2    1.    Plaintiffs Edmund Ang, Shayna DeMedici, and Carlyn Gaver, individually and as

3  representatives of the Class described herein ("Plaintiffs"), and on behalf of the Franklin

4  Templeton 401(k) Retirement Plan ("the Plan"), bring this action under the Employee Retirement

5  Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against

6  Defendants Franklin Resources, Inc. ("Franklin"), the Franklin Templeton 401(k) Retirement

7  Plan Investment Committee ("the Investment Committee"), the Franklin Templeton 401(k)

8  Retirement Plan Committee ("the Plan Committee"), John and Jane Does 1-30 ("Doe

9  Defendants"),    and    Gallagher    Fiduciary    Advisors,    LLC    ("Gallagher")    (collectively,

10  "Defendants"). At the expense of the Plan and its participants and beneficiaries, Defendants

11  breached their fiduciary duties with respect to the Plan in violation of ERISA. Defendants applied

12  a disloyal and imprudent preference for Franklin's proprietary funds within the Plan, despite

13  those funds' poor performance, poor ratings, and unpopularity in the retirement-plan marketplace.

14  Defendants' disloyalty and imprudence has cost participants millions of dollars over the putative

15  Class Period.[1] Plaintiffs bring this action to remedy this unlawful conduct, recover losses to the

16  Plan, and obtain other appropriate relief as provided by ERISA.

17

**PRELIMINARY STATEMENT**

18    2.    To safeguard the retirement savings of American workers, ERISA imposes strict

19  fiduciary duties of loyalty and prudence upon plan sponsors and other plan fiduciaries. 29 U.S.C.

20  § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Howard v. Shay*,

21  100 F.3d 1484, 1488 (9th Cir. 1996) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d

22  Cir. 1982)). Fiduciaries must act "solely in the interest of the participants and beneficiaries,"

23  29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected

24  in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

25    3.    Contrary to these fiduciary duties, Defendants fail to administer the Plan in the

26  sole interest of participants and fail to employ a prudent process for managing the Plan's

27

---

[1] The putative Class Period is "any time on or after July 22, 2019. *Infra* ¶ 101.

28

investments. Rather, Defendants have managed the Plan in a manner that benefits Franklin at the participants' expense. Specifically, Defendants have loaded the Plan's investment menu with Franklin's poorly rated, poor performing, unpopular proprietary funds. For example: at the beginning of the Class Period, 78% of the investments available in the Plan were Franklin proprietary funds,[2] accounting for 75% of the Plan's assets under management ("AUM"), *i.e.*, $1.16 billion in proprietary investments.

4.    The inappropriate favoritism Franklin shows for its proprietary investments is evident when compared to other similarly sized retirement plans. Of the 32 proprietary Franklin funds used in the Plan during the Class Period ("Franklin Funds"), 14 funds (44%) are not used by *any* other defined contribution plan with at least $500 million in assets. And the average usage rate for all the Franklin Funds is miniscule, at 0.4% of such plans.

5.    Meanwhile, many of these Franklin Funds are expensive poor performers, routinely failing to beat their handpicked benchmarks and significantly underperforming more successful alternatives in the market that were highly utilized by fiduciaries of similarly sized plans without proprietary motives.

6.    While this disloyal and imprudent conduct helped promote Defendants' business and generated revenue of over $33 million for Franklin since 2019, it has cost participants millions of dollars in excessive fees and lost investment returns since the start of the Class Period. Based on Defendants' conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), and against Franklin for failing to monitor the fiduciaries it appointed to manage the Plan (Count Two). In connection with these claims, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches, all profits earned by Defendants in connection with Defendants' breaches or the Plan's assets, and other appropriate relief.

---

[2] At various times, Defendants retained two separate sets of target date funds ("TDFs") in the Plan. TDFs "are generally offered as a suite of 'vintages' in five-year or ten-year intervals." *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133 (N.D. Cal. 2022) (citations and quotations omitted). Because the intent is for a participant to invest in one TDF vintage corresponding with their retirement age, each suite of TDFs is considered one investment option.

1

## JURISDICTION AND VENUE

2    7.    Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which

3  provide that participants in an employee retirement plan may pursue a civil action on behalf of the

4  plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary

5  and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

6    8.    This case presents a federal question under ERISA, and therefore this Court has

7  subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

8    9.    Venue is proper pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2),

9  because this is the district where the Plan is administered, where the breaches of fiduciary duties

10  giving rise to this action occurred, and where Defendants may be found.

11

## DIVISIONAL ASSIGNMENT

12    10.    Per the Local Rules of the United States District Court for the Northern District of

13  California, this action is properly assigned to the San Francisco/Oakland Division, because a

14  substantial portion of the events or omissions giving rise to the dispute occurred in San Mateo

15  County. N.D. Cal. Local R. 3-2(d), 3-5(b).

16

## THE PARTIES

17

### PLAINTIFFS

18    11.    Plaintiff Edmund Ang resides in Burlingame, California. He has participated in the

19  Plan since 2016 and is a current participant. During the Class Period and through the Plan, Ang

20  invested in the ClearBridge Large Cap Growth Fund, Franklin Equity Income Fund, and Franklin

21  Growth Fund, among others. As a result, Ang has been financially injured by Defendants'

22  unlawful conduct. Ang's account would be worth more today had Defendants not violated ERISA

23  as described herein.

24    12.    Plaintiff Shayna DeMedici resides in Tampa, Florida. She has participated in the

25  Plan since 1999 and is a current participant. During the Class Period and through the Plan,

26  DeMedici invested in at least the ClearBridge Large Cap Growth Fund, Franklin Equity Income

27  Fund, Franklin Income Fund, and Templeton Foreign Fund. As a result, DeMedici has been

28

- 3 -

financially injured by Defendants' unlawful conduct. DeMedici's account would be worth more today had Defendants not violated ERISA as described herein.

13.    Plaintiff Carlyn Gaver resides in Phoenix, Maryland. She was a participant in the Plan in 2020. During the Class Period and through the Plan, Gaver invested in at least the Franklin Equity Income Fund, Franklin Growth Fund, and Templeton Foreign Fund. As a result, Gaver has been financially injured by Defendants' unlawful conduct. Gaver's account would be worth more today had Defendants not violated ERISA as described herein.

<b>THE PLAN</b>

14.    The Franklin Templeton 401(k) Retirement Plan ("the Plan") was established by Franklin on October 1, 1981.

15.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), covering all eligible current and former employees of Franklin and its subsidiaries and affiliates, including Plaintiffs. The Plan is a qualified plan under 26 U.S.C. § 401 and is the type commonly referred to as a "401(k) plan."

16.    The Plan held approximately $1.6 billion to $2.2 billion in assets and had approximately 5,200 to 6,000 participants during the Class Period, making it one of the largest 401(k) plans in the country, around the 1st percentile based on assets under management ("AUM").

17.    Participants may direct a portion of their earnings to their accounts in the Plan and also may receive contributions from Franklin and participating subsidiaries and affiliates as their employer. Participant contributions are held in trust.

18.    Participants in the Plan are responsible for directing the investment of their balances, choosing from a lineup of designated investment alternatives (i.e. investment options) offered by the Plan.[3] Because the Defendants determine the investment options that are offered,

---

[3] Participants in a defined contribution plan are limited in their investment choices to the lineup of options offered by their plan. *See* INVESTMENT COMPANY INSTITUTE, *The BrightScope/ICI*

the investment lineup maintained by the Defendants is critical to participants' investment results and, ultimately, the retirement benefits they receive.

19.    During the Class Period, between $984 million and $1.25 billion of the Plan's assets were invested in the Franklin Funds, which are managed by Franklin and its subsidiaries and affiliates.

<b>DEFENDANTS</b>

**Franklin Resources, Inc.**

20.    Defendant Franklin Resources, Inc. ("Franklin") is headquartered in San Mateo, California. Franklin is the plan sponsor of the Plan under 29 U.S.C. § 1002(16)(B) and a party in interest to the Plan under 29 U.S.C. § 1002(14). Franklin is also a named fiduciary to the Plan under 29 U.S.C. 1102(a), because it has the ultimate authority to control and manage the operation and administration of the Plan. Franklin is further a functional fiduciary to the Plan under 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority or control with respect to management and administration of the Plan and disposition of Plan assets.

21.    Franklin is also a fiduciary to the Plan because it has the authority to appoint members to and remove members from the Investment Committee and the Plan Committee. It also has the authority to appoint independent fiduciaries. It is well accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8(D-4); *In re JDS Uniphase Corp. ERISA Litig.*, No. 03-04743, 2005 WL 1662131, at *10 (N.D. Cal. July 14, 2005).

22.    The responsibility for appointing and removing members of such a committee or independent fiduciaries carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. 29 C.F.R. § 2509.75-8(FR-17); *Carr v. Int'l Game Tech.*, 770 F. Supp. 2d 1080, 1091 (9th Cir. 2011) ("Where a board of directors has a power to appoint, retain or remove members of a

---

*Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2022*, at 13 (2024), https://www.ici.org/system/files/2025-03/25-rpt-dcplan-profile22-401k.pdf.

committee acting as named fiduciary under a plan, such power will give rise to a duty to monitor that committee under ERISA.").

**The Retirement Plan Committees and Doe Fiduciaries**

23.    Throughout the Class Period, Franklin has delegated a portion of its fiduciary responsibilities for investing Plan assets to internal committees. Prior to the Plan's 2023 amendments, Defendant Franklin Templeton 401(k) Retirement Plan Investment Committee ("the Investment Committee") was one such committee. Specifically, the Investment Committee was a named fiduciary with discretionary authority to control and manage assets of the Plan, and was charged with selecting investments for the Plan and monitoring the performance of investment options in the Plan. The Investment Committee consisted of at least five members.

24.    However, the Plan was amended in 2023 to combine the previous Investment Committee with another Administrative Committee into one Retirement Plan Committee ("the Plan Committee"). Franklin delegated a portion of its fiduciary responsibilities to the Plan Committee, which is a named fiduciary with discretionary authority to control and manage the operation and administration of the Plan. The Plan Committee has discretionary authority to control and manage assets of the Plan. The Plan Committee consists of at least five members.

25.    The Investment Committee and the Plan Committee are fiduciaries to the plan as administrators of the Plan, under 29 C.F.R. § 2509.75-8(D-3), and named fiduciaries of the Plan, under 29 U.S.C. § 1102(a).

26.    Furthermore, in performance of their duties, both the Investment Committee and subsequently the Plan Committee exercised "authority or control respecting management or disposition of the Plan's assets" and are therefore discretionary fiduciaries under 29 U.S.C. § 1002(21)(A).

27.    Defendants John and Jane Does 1-30 ("Doe Defendants") are members of these committees. The identities of the Doe Defendants are not currently known to Plaintiff.

AMENDED CLASS ACTION COMPLAINT
3:25-cv-06130-VC

1   **Gallagher Fiduciary Advisors, LLC**

2          28.    Based on representations made by the Franklin Defendants in filings with this

3   Court, Defendant Gallagher Fiduciary Advisors, LLC ("Gallagher") was appointed by Franklin in

4   2023 to serve as an independent fiduciary with the exclusive responsibility to monitor the

5   performance of the "Flagship Funds," which is a list of twenty-one proprietary funds managed by

6   affiliates of Franklin that are expressly required by Franklin in the Plan's terms to be included as

7   investment options in the lineup. ECF No. 37, at 4. Based on Franklin's representations,

8   Gallagher's responsibility includes authority to determine whether, and to what extent, the

9   Flagship Funds may remain investment options in the Plan. *Id.*

10         29.    Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary

11  liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches

12  of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its

13  duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having

14  knowledge of the breaches.

15                              **FIDUCIARY DUTIES UNDER ERISA**

16                                    **DUTY OF LOYALTY**

17         30.    "ERISA subjects plan fiduciaries to certain fiduciary duties derived from the

18  common law of trusts." *Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1025 (2025). "These

19  duties are the 'highest known to the law.'" *Howard*, 100 F.3d at 1488 (quotation omitted). "One

20  is the duty of loyalty, which requires plan fiduciaries to act 'solely in the interest of the [plan's]

21  participants and beneficiaries.'" *Cunningham*, 145 S. Ct. at 1025 (alteration in original) (quoting

22  29 U.S.C. § 1104(a)(1)(A)). "Among other things, the duty of loyalty requires the fiduciary to

23  'deal fairly and honestly with beneficiaries,' so as 'to ensure that a plan receives all funds to

24  which it is entitled.' *Id.* (citations and quotations omitted).

25         31.    The duty of loyalty is exacting. A plan fiduciary "is held to something stricter than

26  the morals of the market place." *Pegram v. Herdich*, 530 U.S. 211, 224–25 (2000) (quoting

27  *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928)). They are required to fix their gaze with

28

"'an eye single' toward beneficiaries' interests." *Id.* at 235 (quoting *Donovan*, 680 F.2d at 271). If it is "possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Howard*, 100 F.3d at 1488–89 (quoting *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir. 1984)).

### DUTY OF PRUDENCE

32.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (quotation omitted). Plan fiduciaries must "act with the type of 'care, skill, prudence, and diligence under the circumstances' not of a lay person, but of one experienced and knowledgeable with these matters." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1134 (9th Cir. 2013) ("*Tibble I*") (quoting 29 U.S.C. § 1104(a)(1)(B)), *vacated on other grounds*, 575 U.S. 523 (2015). They must "employ[] the appropriate methods to investigate the merits of the investment and to structure the investment." *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1021 (9th Cir. 2025) (quoting *Wright v. Ore. Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004)). And they must "reach a well-reasoned decision after weighing the risks and benefits and considering other alternatives." *Cryer v. Franklin Res., Inc.*, No. 16-CV-04265, 2018 WL 6267856, at *9 (N.D. Cal. Nov. 16, 2018).

33.     In addition to investment performance, the duty of prudence necessarily entails consideration of investment costs. A plan fiduciary must consider "the power the [plan] wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the [fiduciary] has already selected." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("*Tibble III*"). At retirement, employees' benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015) ("*Tibble II*"). "'Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-

- 8 -

contribution plan,' by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019) (quoting *Tibble II*, 575 U.S. at 525).[4]

### DUTY TO MONITOR

34.    The duty of prudence includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that "exists separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments at the outset." *Tibble II*, 575 U.S. at 529. Plan fiduciaries are "required to conduct a regular review of its investment" and, if there are imprudent investments in the plan, the fiduciaries are "under a duty to dispose of them within a reasonable time." *Id.* at 528, 530 (quotation omitted).

35.    It is not enough that there are *some* suitable investments within the plan. It is an error to "rely[] on the participants' ultimate choice over their investments to excuse allegedly imprudent decisions by [plan fiduciaries]." *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022). The fact that there may be some strong performing, appropriately priced investments in the Plan does not permit Defendants to evade liability for the expensive, underperforming, disloyally selected and retained investments. "[P]lan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.* It is a breach of their fiduciary duties to "fail to remove an imprudent investment from the plan within a reasonable time." *Id.*

---

[4] The DOL and SEC have also warned that although the fees and costs associated with investment products and services may seem small, over time they can have a significant impact on an investor's portfolio. *See* U.S. DEP'T OF LAB., *A Look at 401(k) Plan Fees*, at 2 (2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/\401k-plan-fees.pdf (cautioning that a 1% annual difference in fees and expenses can reduce an investor's account balance at retirement by 28%); *accord* U.S. SEC. & EXCH. COMM'N, *How Fees and Expenses Affect Your Investment Portfolio*, at 1, 3 (2014), https://www.sec.gov/investor/alerts/ib_fees_expenses.pdf.

## DEFENDANTS' VIOLATIONS OF ERISA

### I. DEFENDANTS EMPLOYED A DISLOYAL AND IMPRUDENT PROCESS TO MANAGE THE PLAN

#### A. Defendants filled the Plan with Franklin's own unpopular, poorly rated funds.

36.    Throughout the Class Period, the Plan has been dominated by proprietary mutual funds managed by Franklin and its affiliates and subsidies ("Franklin Funds"). At the beginning of the Class Period, 78% of the investment options in the Plan were Franklin Funds, accounting for 75% of the Plan's total AUM.[5]

37.    From 2019 through 2022, every actively managed mutual fund in the Plan was a Franklin Fund. In 2023, the proportion of proprietary investments dropped to 60%, but the *total number* of Franklin Funds increased. Defendants increased the number of proprietary investments from 19 to 21 while adding eight additional nonproprietary investments, resulting in a bloated plan posing the same risks attendant to proprietary funds along with the new hazards of an oversized plan.[6] In 2024, Defendants added yet another proprietary fund, the Putnam Stable Value Fund, despite already having a nonproprietary stable value fund in the Plan.

38.    Most of these proprietary funds were poorly rated investments. Leading independent investment research firm Morningstar rates funds on a descending scale from best to worst as: Gold, Silver, Bronze, Neutral, and Negative. MORNINGSTAR, *Morningstar Medalist Rating Methodology*, at 3 (2025),

---

[5] Each suite of TDFs is counted as one investment option. *See* note 2, *supra*.

[6] One study found that halving the number of investments in a large plan "could lead to potential accumulated savings for these participants over a 20-year period of . . . over $9,400 per participant." Donald B. Keim & Olivia S. Mitchell, *Simplifying Choices in Defined Contribution Retirement Plan Design*, at 19 (Nat'l Bureau of Econ. Rsch., Working Paper No. 21854, 2016). Another study found that,"[o]ther things equal, every ten funds added [to a Plan] was associated with 1.5 percent to 2 percent drop in participation rate," and that as the number of funds surpassed 30, "the decline in participation rates is exacerbated." Sheena S. Iyengar et al., *How Much Choice is Too Much?: Contributions to 401(k) Retirement Plans*, at 9 (Pension Rsch. Council, Working Paper No. 2003-10, 2003). As one group of researchers put it, "a larger number of funds to invest in may be overwhelming for many investors." Maureen Morin et al., *Investing for Retirement: The Moderating Effect of Fund Assortment Size on the 1/N Heuristic*, 49 J. Mktg. Rsch. 547, 548 (2012).

1    https://s21.q4cdn.com/198919461/files/doc_downloads/2025/03/25/1227010-42.pdf. [7] Of the 32

2    Franklin Funds included in the Plan during the class period, 21 were rated "Negative" or

3    "Neutral" by Morningstar. Funds rated "Negative" by Morningstar are "[e]xpected to be the worst

4    performers," while funds rated "Neutral" are "[n]ot expected to outperform . . . but shouldn't

5    subtract as much value as Negative." *Id.*

6         39.    Morningstar has nominally positive ratings for only 10 of the Franklin Funds, with

7    seven of those 10 earning just a "Bronze" rating.[8] A "Bronze" rating indicates that Morningstar

8    expects the fund to "rank in the bottom half of all active investments in the Morningstar Category

9    expected to generate positive net alpha." *Id.* That is, Bronze funds are in the bottom half of the

10   universe of funds that would even be remotely considered within an investment category.

11        40.    Morningstar's commentary warns potential investors of many of the deficiencies

12   found in the Franklin Funds. For example, Morningstar stated that the Clearbridge Large Cap

13   Growth Fund "can struggle to stand out" and noted the Franklin Growth Opportunities Fund's

14   "historical struggles with weak stock selection." Morningstar warned of "poor picks" and "stock-

15   selection issues" in the Templeton Foreign Fund. Morningstar said the Franklin Income Fund

16   "struggled over extended periods of time" and called its long-term performance "middling," while

17   stating that the Frankling Growth Fund's "historical returns looked unimpressive." Morningstar

18   said it was "not clear that the [Franklin Mutual Global Discovery Fund] has a long term edge,"

19   and that "it's not clear the team can consistently execute." And, at times, even the relatively

20   technical and staid language of financial analysis gives way to flashing alarm lights, such as when

21   Morningstar warned investors to "[p]roceed with caution" with the Templeton World Fund, or

22   that the BrandywineGLOBAL Global Opportunities Bond Fund was "[n]ot for the faint-hearted."

23        41.    Commentary like this was nothing new for the Franklin Funds. Similar notes and

24   concerns were well-known in the market for years preceding this action. Other fiduciaries

---

[7] Morningstar, Inc. is an independent financial services firm recognized by federal courts as "the most well-respected and accepted financial fund database." *See Phillips v. Cobham Advanced Elec. Sols., Inc.*, No. 23-CV-03785, 2024 WL 3228097, at *3 (N.D. Cal. June 8, 2024).

[8] The remaining proprietary fund is the Putnam Stable Value Fund. Morningstar does not rate stable value funds.

responsible for the investments in large plans comparable to the Plan clearly responded to warnings like these and avoided the Franklin Funds. In 2023, the most popular Franklin Fund in the Plan[9] was used in 69 other non-government, ERISA-covered defined contribution plans[10] with over $500 million in assets. There were 2,288 such plans, which means the most widely adopted, market-approved Franklin Fund was used in just 3% of comparable plans.

42.    Meanwhile, as of that same year, 14 of the 32 Franklin Funds used in the Plan at any point over the Class Period were not used by any such plan other than Franklin's. This means that almost half the Plan's menu was not used by *any of the other* 2,288 plans with over $500 million in assets. The average usage rate of all the Franklin Funds in such plans is 0.4%.

43.    For example, in 2023 the Franklin Growth Fund was used in only seven other plans with over $500 million in assets (0.31% of such plans), the Templeton Foreign Fund in three other plans (0.13%), and the Franklin Income Fund in zero other plans (0.00%). Meanwhile, these funds remained in the Plan throughout the Class Period with between $264 million and $437 million in assets combined, accounting for 17% to 20% of the Plan's total AUM.

44.    The overall investment market also responded to the poor reviews, poor performance, and high fees of the Franklin Funds. Over the Class Period,[11] the Franklin Funds used in the Plan experienced $139.4 billion in net outflows of assets under management. Over that time, only 3 of the 31 Franklin Funds used in the Plan through 2023 saw a net increase in AUM.

45.    In particular, investors fled from some of the Plan's very worst performing funds. The Franklin Income Fund lost $22 billion in AUM, the Franklin Growth Fund lost $10.4 billion, and the Templeton Foreign Fund lost $3.5 billion.

---

[9] The Western Asset Core Plus Bond Fund.
[10] This includes 401(k) plans and 403(b) plans, which are defined contribution plans generally akin to 401(k) plans but only available to nonprofit entities. *See 403(b) vs. 401(k) Plans: What's the Difference?*, INVESTOPEDIA, (Jan. 11, 2025), https://www.investopedia.com/ask/answers/100314/what-difference-between-401k-plan-and-403b-plan.asp (last visited July 8, 2025).
[11] Fund AUM data is only available through April 2025, so the net flow information excludes May and June 2025.

46.    As explained below, those funds and other Franklin Funds like them underperformed both their benchmarks and market peers throughout the Class Period while imposing costs almost twice what was charged by superior options on the market.

47.    Thus, the Plan's investment lineup displays Defendants' blatant favoritism toward Franklin's proprietary investments. This favoritism has led to the payment of excessive investment management fees by participants to Franklin and its subsidiaries and affiliates, a failure to prudently monitor and remove underperforming proprietary investment options from the Plan, and a failure to engage in a prudent and loyal process in the selection of new investment options for the Plan.

**B. Defendants' use of proprietary funds caused Participants to incur excessive fees.**

48.    The Franklin Funds are actively managed. While a fiduciary may consider higher-cost, actively managed mutual funds as an alternative to lower-cost alternatives, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs. . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." *See* Restatement (Third) of Trusts § 90 cmt. h(2); *see also id.* § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."). As discussed below, the Franklin Funds did not earn their fees with superior performance. *See* Section I.C, *infra*.

49.    Moreover, even in comparison to other *actively* managed funds, the Franklin Funds charged higher fees relative to non-proprietary alternatives used by similarly sized plans. Accordingly, it is reasonable to infer that Defendants failed to prudently investigate lower-cost, nonproprietary alternatives.

50.    While injurious to the Plan's participants, these high fees benefited Franklin substantially. Franklin earned an average of $6.7 million per year in investment management fees from Plan participants invested in these expensive, actively managed Franklin Funds, totaling

- 13 -

$33.4 million from 2019 through 2023 alone.[12]

| 2019 | 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|------|
| $6,576,300.65 | $7,021,075.79 | $7,827,082.79 | $6,039,401.03 | $5,952,425.55 |

51.    The Franklin Funds' excessive fees are not due to a single fund's exorbitant costs, but rather the result of uniformly high fees across the Plan's proprietary investment options. In 2022,[13] the Franklin Funds' fees were 96% higher than the average expense ratio for funds within the same asset class category among plans with over $1 billion in assets, almost double the cost. And even when looking only at leading *actively* managed funds invested in similar styles to the Franklin Funds, their fees were 12% higher than average, with some as high as 108% above average. See Exhibit A for a table containing an expense comparison for all the Franklin Funds.

52.    Because the Plan is laden with high-cost, proprietary mutual funds managed by Franklin and its subsidiaries and affiliates, the Plan's expenses are significantly higher than other comparable retirement plans. This is evidenced by comparing the Plan's expenses with the average expense ratio associated with 401(k) plans with over $1 billion in assets:

---

[12] Franklin's earnings from the Plan are calculated based on the Plan's annual investments at the end of each year and the reported annual expense ratios for each Franklin Fund. Plan investment data is not publicly available for 2024 and 2025.

[13] 2022 is the most recent year for which average fee data is available. *See infra* note 15.

- 14 -

| | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| **Plan Expense Ratio[14]** | 0.50% | 0.49% | 0.42% | 0.41% |
| **Average 401(k) Expense Ratio[15]** | 0.28% | 0.27% | 0.26% | 0.27% |
| **% Fee Excess Over 401(k) Average** | 79% | 81% | 62% | 52% |

53.    Had Defendants prudently monitored the Plan's investments—using a process that was not polluted by self-interest and disloyalty—Defendants would have removed the Franklin Funds from the Plan or replaced them with nonproprietary funds that offered comparable investment management services and superior performance at significantly less expense. Given the excessive fees charged by the Franklin Funds, and the availability of comparable or superior funds with significantly lower expenses, the compensation paid to Franklin and its subsidiaries and affiliates for their services was unreasonably high.

**C.    Defendants failed to remove underperforming proprietary funds.**

54.    Defendants' imprudent monitoring and retention of underperforming funds shows their favoritism for the Franklin Funds.

55.    In part because of their high fees, *see* Section I.B, *supra*, the Franklin Funds tended to underperform, costing the Plan tens of millions of dollars in lost profits that participants otherwise would have had in their accounts if Defendants had managed the Plan in a loyal and prudent manner. A prudent fiduciary offering high-fee proprietary investments like the Franklin Funds would continuously monitor whether the extra fees were justified by a reasonable expectation of increased returns. *See Baker v. John Hancock Life Ins. Co. (U.S.A.)*, No. 20-CV-

---

[14] The Plan expense ratio is a calculated as the weighted average based on participants' investments at the end of each plan year. Because many of the Plan's investments are held in CIT vehicles and thus lack publicly reported fee information, the costs of those investments are estimated based on the 2024 fee information available to Plaintiffs. This average considers both investment expenses and the Plan's administrative and other expenses charged to participants.

[15] The average 401(k) expense ratio reflects the plan-weighted average expense ratio for 401(k) plans with more than $1 billion in assets. *See* INVESTMENT COMPANY INSTITUTE, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019*, at 49 (2022), https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf; INVESTMENT COMPANY INSTITUTE, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2020*, at 49 (2023), https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf; INVESTMENT COMPANY INSTITUTE, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2021*, at 49 (2024), https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf; INVESTMENT COMPANY INSTITUTE, *supra* note 3, at 49 (providing 2022 data). ICI average plan costs for 2023 are not available.

- 15 -

10397, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) ("ERISA permits a financial services firm to offer its proprietary funds in its retirement plan and that this is a common practice in the industry. That said, an ERISA fiduciary has 'a continuing duty to monitor [plan] investments and remove imprudent ones.'" (citation and quotation omitted)). Defendants failed to do so and maintained an investment lineup predominated by actively managed proprietary funds despite significant and prolonged underperformance in comparison to both the funds' benchmarks and superior investment alternatives managed in a similar style. Thus, Defendants failed to justify the high expense of the Franklin Funds with superior performance.

### 1.    The Franklin Income Fund

56.    One illustrative example of Defendants' flawed monitoring process is the disloyal and imprudent retention of the Franklin Income Fund. The Franklin Income Fund is categorized as a "Moderate Allocation" fund. Funds categorized as Moderate Allocation generally seek to invest 50% to 70% of their assets in stocks, with the remaining assets in bonds. *See Moderate Allocation Funds*, MORNINGSTAR, https://www.morningstar.com/best-investments/moderate-allocation-funds (last visited July 17, 2025). The Franklin Income Fund's prospectus states that it seeks "to maximize income while maintaining prospects for capital appreciation." The prospectus explains that Franklin intends to accomplish this, at least in part, by investing between 20% and 30% of the fund's assets in "junk" bonds.[16]

57.    To the detriment of participants, the Franklin Income Fund has failed to maximize income. The fund has routinely underperformed benchmark indexes intended to measure its success within the Moderate Allocation category.

58.    The SEC requires investment companies to compare the performance of their fund to that of a benchmark comprising a "broad-based securities market index," and encourages them

---

[16] "Junk" bonds are bonds which have been rated below investment grade by a credit ratings agency, "carry a higher risk of default than most bonds issued by corporations and governments," and are generally "issued by companies that are financially struggling and have a high risk of defaulting or not paying their interest payments or repaying the principal to investors." James Chen, INVESTOPEDIA, *What Is a Junk Bond? Definition, Credit Ratings, and Example* (May 21, 2024), https://www.investopedia.com/terms/j/junkbond.asp (last visited July 8, 2025).

to provide similar comparisons to additional "narrow" benchmark indexes that are "tailored to the assets and strategy of the fund" and "reflect the market sectors in which the Fund invests." Alycia Chin et al., U.S. SEC. & EXCH. COMM'N, *How Do Consumers Understand Investment Quality?: The Role of Performance Benchmarks*, at 9 & n.7 (Off. of the Inv. Advoc., Working Paper No. 2022-01, 2022). It is important to provide a proper benchmark for a fund because, "if a benchmark is not well-matched to a fund, it could provide a confusing or distorting signal about whether a fund is performing relatively well." *Id.* at 7.

59.    Courts agree with the importance of identifying a "meaningful benchmark" for the purposes of judging a fiduciary's exercise of prudence. *Intel Corp. Inv. Pol'y Comm.*, 137 F.4th at 1022 (quoting *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022)). A "plaintiff 'must provide a sound basis for comparison,'" that is "a relevant comparator with similar objectives." *Id.* (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)).

60.    The Franklin Income Fund's prospectus identifies a series of largely unhelpful benchmarks. The Franklin Income Fund's prospectus first identifies the Bloomberg US Aggregate Index, a 100% bond index, as a benchmark. It then identifies the Russell 3000 Index, a 100% stock index. It then identifies a custom benchmark with a 50/50 stock-to-bond allocation utilizing the MSCI USA High Dividend Yield Index for the stock component, with the bond component comprised of 25% Bloomberg High Yield Very Liquid Index and 25% Bloomberg US Aggregate Index. The MSCI Index is a specialty index focusing on stocks with high dividend payouts and excluding stocks which might reduce dividends. The Bloomberg High Yield Index tracks a more liquid sector of the overall bond banket, focusing on bonds issued less than five years prior with at least $500 million outstanding. The basis for this esoteric benchmark is not readily apparent.

61.    To evaluate the Franklin Income Fund, Plaintiffs employ benchmarks composed of 60% S&P 500 / 40% Bloomberg US Aggregate Bond Index, and 40% S&P 500 / 60% Bloomberg US Aggregate Bond Index. The Bloomberg Index is commonly used to reflect the performance of

the overall U.S. bond market. Meanwhile, the S&P 500 is "widely regarded as the best single gauge of large-cap U.S. equities," is "commonly used in academic studies," and "is widely recognized as reflecting the overall state of the U.S. economy." Chin et al., *supra*, at 10 n.10. The separate 60/40 and 40/60 allocations allow the Court to evaluate whether the Franklin Income Fund is outperforming when compared to the high end of stock allocation in a Moderate Allocation fund (70%) as well as the low-end (50%). Plaintiffs also compare the Franklin Income Fund to Franklin's customized benchmark, to track its performance to a benchmark that the fund's managers presumably believed was "narrowly tailored to the assets and strategy of the fund."

62.    The Franklin Income Fund performed worse than all three benchmarks, on a rolling 10-year basis, every year during the Class Period. On a 5-year basis, it underperformed the 60/40 benchmark every year and the other two benchmarks from 2019 through 2021.

| Fund | 2019 5-Year Return | 2020 5-Year Return | 2021 5-Year Return | 2022 5-Year Return | 2023 5-Year Return | 2024 5-Year Return |
|---|---|---|---|---|---|---|
| **Franklin Income R6 (FNCFX)** | 5.20% | 7.69% | 7.93% | 5.09% | 8.03% | 6.35% |
| *60% S&P 500 TR USD/40% Bloomberg US Aggregate Bond TR USD* | 8.37% | 11.11% | 12.62% | 5.96% | 9.98% | 8.67% |
| *40% S&P 500 TR USD/60% Bloomberg US Aggregate Bond TR USD* | 6.64% | 8.94% | 9.63% | 4.07% | 7.06% | 5.69% |
| *50% MSCI USA High Dividend Yield Index NR USD/25% Bloomberg High Yield Very Liquid TR USD/25% Bloomberg US Aggregate Bond TR USD* | 7.73% | 8.86% | 8.58% | 4.36% | 6.38% | 4.65% |

| Fund | 2019 10-Year Return | 2020 10-Year Return | 2021 10-Year Return | 2022 10-Year Return | 2023 10-Year Return | 2024 10-Year Return |
|---|---|---|---|---|---|---|
| **Franklin Income R6 (FNCFX)** | 7.30% | 6.40% | 7.87% | 5.96% | 5.44% | 5.77% |
| *60% S&P 500 TR USD/40% Bloomberg US Aggregate Bond TR USD* | 9.77% | 10.02% | 11.14% | 8.08% | 8.09% | 8.52% |
| *40% S&P 500 TR USD/60% Bloomberg US Aggregate Bond TR USD* | 7.80% | 8.01% | 8.41% | 5.78% | 6.05% | 6.16% |
| *50% MSCI USA High Dividend Yield Index NR USD/25% Bloomberg High Yield Very Liquid TR USD/25% Bloomberg US Aggregate Bond TR USD* | 9.72% | 8.83% | 8.89% | 6.95% | 6.31% | 6.18% |

63.    The Franklin Income Fund has also underperformed its peer funds. In order to supply "relevant comparator[s] with similar objectives," *Intel Corp. Inv. Pol'y Comm.*, 137 F.4th at 1022, Plaintiffs have calculated a "Peer Group Average" based on the lowest-cost share class of the top ten actively managed funds by AUM in the relevant Morningstar category. Funds were excluded from the average if they (1) were created after January 1, 2010 (short performance history); (2) are now defunct (no longer investable); or (3) are managed by Franklin or its affiliates and subsidiaries.

64.    The Franklin Income Fund underperformed its Peer Group Average of Moderate Allocation funds every year of the Class Period on rolling 5- and 10-year bases. And this is not merely underperformance in the aggregate. When pulling specific comparator funds out of the Peer Group, the Franklin Income Fund still underperformed every year on 5- and 10-year bases.

| Fund | 2019 5-Year Return | 2020 5-Year Return | 2021 5-Year Return | 2022 5-Year Return | 2023 5-Year Return | 2024 5-Year Return |
|---|---|---|---|---|---|---|
| **Franklin Income R6 (FNCFX)** | 5.20% | 7.69% | 7.93% | 5.09% | 8.03% | 6.35% |
| *Peer Group Average* | 8.25% | 11.02% | 12.67% | 6.50% | 10.58% | 9.05% |
| T. Rowe Price Capital Appreciation I (TRAIX) | 10.63% | 13.21% | 15.29% | 9.23% | 12.93% | 10.69% |
| Vanguard Wellington Adm (VWENX) | 8.65% | 10.84% | 12.40% | 6.02% | 9.66% | 8.24% |
| Columbia Balanced Inst3 (CBDYX) | 7.66% | 10.83% | 12.53% | 5.65% | 11.13% | 9.57% |

| Fund | 2019 10-Year Return | 2020 10-Year Return | 2021 10-Year Return | 2022 10-Year Return | 2023 10-Year Return | 2024 10-Year Return |
|---|---|---|---|---|---|---|
| **Franklin Income R6 (FNCFX)** | 7.30% | 6.40% | 7.87% | 5.96% | 5.44% | 5.77% |
| *Peer Group Average* | 9.96% | 10.17% | 11.79% | 8.81% | 8.28% | 8.65% |
| T. Rowe Price Capital Appreciation I (TRAIX) | 11.89% | 12.30% | 13.88% | 10.92% | 10.60% | 10.66% |
| Vanguard Wellington Adm (VWENX) | 9.99% | 9.95% | 11.46% | 8.46% | 7.96% | 8.44% |
| Columbia Balanced Inst3 (CBDYX) | 9.73% | 10.23% | 11.61% | 8.19% | 8.20% | 8.61% |

65.     These are relevant comparators with similar objectives. Morningstar categorizes them all as "Moderate Allocation" funds, that target a 50% to 70% allocation to equities (e.g. stocks) with the rest in debt such as bonds. The Franklin Income, T. Rowe Price Capital Appreciation, Vanguard Wellington, and Columbia Balanced Funds share highly similar investment goals: "maximize income while maintaining prospects for capital appreciation," (Franklin); "seeks long-term capital appreciation" while "hold[ing] fixed income and other securities to help preserve principal value," (T. Rowe); "maximize income while maintaining prospects for capital appreciation," (Vanguard); and "high total return by investing in common stocks and debt securities," (Columbia). All four funds pursue stocks with a "value" investing style: T. Rowe "uses a value approach in selecting investments . . . . seek[ing] to identify

companies that seem undervalued by various measures, such as price/book value, and may be temporarily out of favor but have good prospects;" Vanguard seeks "undervalued stocks of primarily established large companies with durable businesses;" Columbia seeks "securities to be out of favor and, in turn, potentially undervalued" and Franklin seeks "undervalued or out-of-favor securities it believes offer opportunities for income today and significant growth tomorrow." The Columbia Fund may invest up to 20% of its assets in non-U.S. securities, while the T. Rowe, Vanguard, and Franklin Funds go up to 25%. The T. Rowe and Columbia Funds use a "junk bond" investing strategy like the Franklin Income Fund, with Franklin and T. Rowe investing up to 30% in junk bonds and Columbia 10%. These individual peer funds provide an additional meaningful benchmark by which to judge the Franklin Income Fund.

66.      While there can be a range of risk profiles within the Moderate Allocation category, the Franklin Income Fund still underperforms its peers when accounting for risk. Alpha is a metric used to measure a manager's skill on a risk-adjusted basis. That is, does the investment manager have the "ability to beat the market." Positive alpha shows skill, an alpha of zero shows zero skill, and negative alpha shows that the manager made decisions that were worse than simply tracking the calculation benchmark. *See* James Chen, INVESTOPEDIA, *Alpha: Its Meaning in Investing, With Examples* (Feb. 23, 2024), https://www.investopedia.com/terms/a/alpha.asp (last visited July 8, 2025). Thus, alpha provides a common metric to evaluate fund performance across risk profiles.

When calculating alpha against the 40% S&P 500 / 60% Bloomberg US Aggregate Bond Index benchmark—a low bar to clear for a Moderate Allocation fund expected to perform in line with 50% stocks, at the minimum—the Franklin Income Fund demonstrates a shocking lack of manager skill. On a risk-adjusted basis, the fund underperformed its peers every year on a rolling 10-year basis during the Class Period, posting negative alpha every year. And the Franklin Income Fund's underperformed all of its peers every year except one on a 5-year basis, when it outperformed just the Columbia Balanced Fund in 2022.

*Calculation Benchmark: 40% S&P 500 - 60% Bloomberg Agg*

- 21 -

| Fund | 2019 5-Year Alpha | 2020 5-Year Alpha | 2021 5-Year Alpha | 2022 5-Year Alpha | 2023 5-Year Alpha | 2024 5-Year Alpha |
|---|---|---|---|---|---|---|
| **Franklin Income R6 (FNCFX)** | -3.64% | -3.74% | -3.85% | 1.01% | 0.93% | 0.82% |
| T. Rowe Price Capital Appreciation I (TRAIX) | 1.29% | 0.22% | 1.03% | 4.11% | 4.18% | 4.12% |
| Vanguard Wellington Adm (VWENX) | -0.44% | -1.52% | -1.16% | 1.21% | 1.40% | 1.90% |
| Columbia Balanced Inst3 (CBDYX) | -1.70% | -2.44% | -1.88% | 0.75% | 2.47% | 3.01% |

*Calculation Benchmark: 40% S&P 500 - 60% Bloomberg Agg*

| Fund | 2019 10-Year Alpha | 2020 10-Year Alpha | 2021 10-Year Alpha | 2022 10-Year Alpha | 2023 10-Year Alpha | 2024 10-Year Alpha |
|---|---|---|---|---|---|---|
| **Franklin Income R6 (FNCFX)** | -3.96% | -4.84% | -3.26% | -0.37% | -0.90% | -0.53% |
| T. Rowe Price Capital Appreciation I (TRAIX) | -0.22% | 0.08% | 1.36% | 3.08% | 2.92% | 3.11% |
| Vanguard Wellington Adm (VWENX) | -1.59% | -1.66% | -0.68% | 0.96% | 0.63% | 1.15% |
| Columbia Balanced Inst3 (CBDYX) | -2.30% | -1.96% | -1.01% | 0.58% | 0.62% | 1.11% |

67.    The fiduciaries of comparable retirements plans clearly responded to the Franklin Income Fund's poor performance and subpar management. The Franklin Income Fund was not used by a single other non-government, ERISA-covered defined contribution plan with over $500 million in assets.[17] Meanwhile, some of the Franklin Income Fund's competitors were used by up to 8.9% of such plans.[18]

| Fund | # of Plans | Utilization Rate |
|---|---|---|
| **Franklin Income R6 (FNCFX)** | 0 | 0.0% |
| T. Rowe Price Capital Appreciation I (TRAIX) | 21 | 0.9% |
| Vanguard Wellington Adm (VWENX) | 204 | 8.9% |
| Columbia Balanced Inst3 (CBDYX) | 7 | 0.3% |

---

[17] Data from Brightscope. There were 2,288 such plans, total.

[18] The comparator funds are all taken from the peer group of the ten funds with the highest AUM in their respective Morningstar category. *See supra* paras. 61–62.

68.     The Franklin Income Fund has remained in the Plan throughout the Class Period. Given this chronic underperformance on both absolute and risk-adjusted bases, a loyal and prudent fiduciary would have removed the Franklin Income Fund from the Plan. Defendants' failure to do so supports an inference that their process for monitoring the Plan's investments was disloyal and imprudent.

### 2.     The Franklin Growth Fund

69.     Another example of a disloyally and imprudently retained fund is the Franklin Growth Fund. The Franklin Growth Fund has remained in the Plan for the entire Class Period while remaining a poor investment for the Plan participants. The Franklin Growth Fund's sole investment goal is capital appreciation, i.e. strong performance. It intends to accomplish this by pursuing a growth strategy, that is by investing in companies that are "anticipated to grow at a rate significantly above the average growth for the market."[19] Unfortunately, participants who invested in this fund have not been rewarded with strong performance.

70.     To evaluate the Franklin Growth Fund, Plaintiffs compare it to the Russell 1000 Growth Index. The fund's prospectus identifies the S&P 500 as its broad-based benchmark and the Russell 1000 Growth as its narrowly tailored benchmark. The S&P 500 includes value stocks along with growth stocks and is thus a "blended" index. Value stocks are "stocks that are trading for less than their intrinsic value. Meanwhile, growth investing focuses on stocks of businesses that have a potential for above-average growth in terms of profits, sales, or market share." Tim Smith, INVESTOPEDIA, *Value Stock: What It Is, Examples, Pros and Cons* (May 8, 2023), https://www.investopedia.com/terms/v/valuestock.asp (last visited July 8, 2025). Because the Russell 1000 Growth Index measures the performance of growth stocks, which is the investment focus of the Franklin Growth Fund, it is a far more "relevant comparator with similar objectives" by which to judge the Franklin Growth Fund. *See Intel Corp. Inv. Pol'y Comm.*, 137 F.4th at 1022.

---

[19] Adam Hayes, INVESTOPEDIA, *Growth Stock: What It Is, Examples, vs. Value Stock* (Dec. 11, 2023), https://www.investopedia.com/terms/g/growthstock.asp (last visited July 8, 2025).

71. The Franklin Growth Fund has underperformed the Russell 1000 Growth Index, on rolling 5- and 10-year bases every year during the Class Period.

| Fund | 2019 5-Year Return | 2020 5-Year Return | 2021 5-Year Return | 2022 5-Year Return | 2023 5-Year Return | 2024 5-Year Return |
|---|---|---|---|---|---|---|
| **Franklin Growth R6 (FIFRX)** | 12.78% | 18.50% | 21.27% | 9.14% | 15.39% | 12.77% |
| *Russell 1000 Growth TR USD* | 14.63% | 21.00% | 25.32% | 10.96% | 19.50% | 18.96% |

| Fund | 2019 10-Year Return | 2020 10-Year Return | 2021 10-Year Return | 2022 10-Year Return | 2023 10-Year Return | 2024 10-Year Return |
|---|---|---|---|---|---|---|
| **Franklin Growth R6 (FIFRX)** | 13.63% | 15.14% | 17.40% | 12.64% | 12.50% | 12.77% |
| *Russell 1000 Growth TR USD* | 15.22% | 17.21% | 19.79% | 14.10% | 14.86% | 16.78% |

72. The Franklin Growth Fund has also underperformed its peer funds. The fund trailed its Peer Group Average[20] every year of the Class Period on a rolling 10-year basis, and every year except one on a 5-year basis. When pulling specific comparator funds out of the Peer Group, The Franklin Fund underperformed every year on 5- and 10-year bases.

| Fund | 2019 5-Year Return | 2020 5-Year Return | 2021 5-Year Return | 2022 5-Year Return | 2023 5-Year Return | 2024 5-Year Return |
|---|---|---|---|---|---|---|
| **Franklin Growth R6 (FIFRX)** | 12.78% | 18.50% | 21.27% | 9.14% | 15.39% | 12.77% |
| *Peer Group Average* | 14.20% | 21.04% | 24.89% | 8.77% | 16.80% | 16.76% |
| Fidelity Growth Company K (FGCKX) | 15.72% | 26.38% | 30.11% | 12.53% | 22.71% | 22.50% |
| JPMorgan Large Cap Growth R6 (JLGMX) | 15.52% | 24.42% | 29.23% | 14.27% | 21.19% | 20.27% |
| MFS Growth R6 (MFEKX) | 15.36% | 20.15% | 24.76% | 9.72% | 16.10% | 15.07% |

---

[20] Methodology further explained in para. 61, *supra*.

- 24 -

| Fund | 2019 10-Year Return | 2020 10-Year Return | 2021 10-Year Return | 2022 10-Year Return | 2023 10-Year Return | 2024 10-Year Return |
|---|---|---|---|---|---|---|
| **Franklin Growth R6 (FIFRX)** | 13.63% | 15.14% | 17.40% | 12.64% | 12.50% | 12.77% |
| *Peer Group Average* | 14.99% | 17.40% | 19.67% | 13.02% | 13.45% | 15.46% |
| Fidelity Growth Company K (FGCKX) | 16.82% | 20.72% | 23.12% | 16.14% | 16.93% | 19.06% |
| JPMorgan Large Cap Growth R6 (JLGMX) | 15.77% | 18.62% | 20.30% | 15.50% | 15.67% | 17.87% |
| MFS Growth R6 (MFEKX) | 15.03% | 16.63% | 19.26% | 13.08% | 13.04% | 15.22% |

73.     These are relevant comparators with similar objectives. The Franklin Growth, Fidelity Growth Company, JPMorgan Large Cap Growth, and MFS Growth Funds all have the same, sole investment goal: "capital appreciation." All four funds utilize a "growth" investing style: "companies in new and emerging industries where growth is expected to be above average;" (Franklin); "companies the Adviser believes have above average growth potential," (Fidelity); "companies with a history of above-average growth or companies expected to enter periods of above-average growth," (JPMorgan); and "companies it believes have above average potential with respect to the rate and duration of earnings growth," (MFS). Three of the four funds use the Russell 1000 Growth Index as a narrowly tailored benchmark (Franklin, JPMorgan, and MFS), while the remaining fund utilizes the Russell 3000 Growth as a benchmark (Fidelity). These individual peer funds provide an additional meaningful benchmark by which to judge the Franklin Growth Fund.

74.     Going deeper than raw performance, the Franklin Growth Fund fails to deliver performance on a risk-adjusted basis. Comparing that fund's alpha against its market peers, as calculated against the Russell 1000 Growth, shows that the Franklin Growth Fund's underperformance was caused by its managers' lack of skill. The Franklin Growth Fund's alpha has consistently underperformed its comparator funds on rolling 5- and 10-year bases every year during the Class Period. It showed negative alpha every single year of the Class Period on 5- and

- 25 -

10-year bases, indicating that Franklin Growth Fund's managers persistently made worse decisions than simply investing in an index fund tracking the Russell 1000 Growth.

*Calculation Benchmark: Russell 1000 Growth TR USD*

| Fund | 2019 5-Year Alpha | 2020 5-Year Alpha | 2021 5-Year Alpha | 2022 5-Year Alpha | 2023 5-Year Alpha | 2024 5-Year Alpha |
|---|---|---|---|---|---|---|
| **Franklin Growth R6 (FIFRX)** | -0.76% | -1.07% | -1.92% | -1.11% | -2.51% | -4.20% |
| Fidelity Growth Company K (FGCKX) | -1.12% | 1.42% | 1.42% | 0.76% | 1.36% | 1.85% |
| JPMorgan Large Cap Growth R6 (JLGMX) | 0.00% | 1.20% | 2.18% | 3.07% | 1.79% | 1.36% |
| MFS Growth R6 (MFEKX) | 1.18% | 0.90% | 1.35% | -0.60% | -1.85% | -2.51% |

*Calculation Benchmark: Russell 1000 Growth TR USD*

| Fund | 2019 10-Year Alpha | 2020 10-Year Alpha | 2021 10-Year Alpha | 2022 10-Year Alpha | 2023 10-Year Alpha | 2024 10-Year Alpha |
|---|---|---|---|---|---|---|
| **Franklin Growth R6 (FIFRX)** | -0.71% | -0.79% | -0.68% | -0.41% | -1.20% | -2.43% |
| Fidelity Growth Company K (FGCKX) | -0.43% | 0.64% | 0.42% | 0.54% | 0.51% | 0.57% |
| JPMorgan Large Cap Growth R6 (JLGMX) | -0.11% | 0.19% | -0.56% | 1.20% | 0.72% | 0.90% |
| MFS Growth R6 (MFEKX) | 0.00% | 0.42% | 0.64% | -0.23% | -0.88% | -0.60% |

75.     The fiduciaries of comparable retirement plans clearly responded to the Franklin Growth Fund's poor performance and subpar management. The Franklin Growth Fund was used in just 7 other non-government, ERISA-covered defined contribution plan with over $500 million in assets. Meanwhile, some of the fund's competitors were used by 31 times more of those plans.

| Fund | # of non-Franklin Plans | Utilization Rate |
|---|---|---|
| **Franklin Growth R6 (FIFRX)** | 7 | 0.3% |
| Fidelity Growth Company K (FGCKX) | 208 | 9.1% |
| JPMorgan Large Cap Growth R6 (JLGMX) | 219 | 9.6% |
| MFS Growth R6 (MFEKX) | 36 | 1.6% |

76. The Franklin Growth Fund has remained in the Plan throughout the Class Period. Given this chronic underperformance on both absolute and risk-adjusted bases, a loyal and prudent fiduciary would have removed the Franklin Growth Fund from the Plan. Defendants' failure to do so supports an inference that their process for monitoring the Plan's investments was disloyal and imprudent.

### 3. The Templeton Foreign Fund

77. Yet another example of a disloyally and imprudently retained fund is the Templeton Foreign Fund. The Templeton Foreign Fund has remained in the Plan for the entire Class Period while remaining a poor investment for the Plan participants. The Templeton Foreign Fund's sole investment goal is long-term capital growth, i.e. strong performance. It intends to accomplish this by (1) investing predominantly in foreign securities (e.g. non-United States stocks), including developing markets, and (2) pursuing a value strategy, that is by investing in companies that "are often underrated or ignored by the market, but they may eventually gain value."[21] Again, participants who invested in this proprietary Franklin Fund were not rewarded with strong performance.

78. To evaluate the Templeton Foreign Fund, Plaintiffs compare it to the MSCI All Country World Index ex USA. The fund's prospectus identifies this index as its sole benchmark. Franklin was free to provide investors other benchmarks but did not, indicating that it views the MSCI index as well-matched to the Templeton Foreign Fund. *See supra* para. 56. An independent review of this benchmark confirms its suitability. The Templeton Foreign Fund makes stock investments in only non-United States companies. It does not restrict itself to specific countries or regions and invests in companies of all sizes. The MSCI index covers the stocks of non-United States companies, including developing markets, covering around 85% of foreign stocks, including value stocks.

79. The Templeton Foreign fund has underperformed the MSCI All Country World Index ex USA on rolling 5- and 10-year bases every year during the Class Period.

---

[21] *See* Hayes, *supra* note 19.

| Fund | 2019 5-Year Return | 2020 5-Year Return | 2021 5-Year Return | 2022 5-Year Return | 2023 5-Year Return | 2024 5-Year Return |
|------|------|------|------|------|------|------|
| **Templeton Foreign R6 (FTFGX)** | 3.48% | 4.90% | 3.64% | -0.35% | 6.79% | 3.73% |
| *MSCI ACWI Ex USA NR USD* | 5.51% | 8.93% | 9.61% | 0.88% | 7.08% | 4.10% |

| Fund | 2019 10-Year Return | 2020 10-Year Return | 2021 10-Year Return | 2022 10-Year Return | 2023 10-Year Return | 2024 10-Year Return |
|------|------|------|------|------|------|------|
| **Templeton Foreign R6 (FTFGX)** | 4.29% | 3.43% | 5.41% | 3.30% | 2.71% | 3.60% |
| *MSCI ACWI Ex USA NR USD* | 4.97% | 4.92% | 7.28% | 3.80% | 3.83% | 4.80% |

80.     The Templeton Foreign fund has also underperformed its peer funds. The fund trailed its Peer Group Average[22] every year of the Class Period on rolling 5- and 10-year bases. When pulling specific comparator funds out of the Peer Group, the Templeton Foreign Fund also underperformed every year on 5- and 10-year bases.

| Fund | 2019 5-Year Return | 2020 5-Year Return | 2021 5-Year Return | 2022 5-Year Return | 2023 5-Year Return | 2024 5-Year Return |
|------|------|------|------|------|------|------|
| **Templeton Foreign R6 (FTFGX)** | 3.48% | 4.90% | 3.64% | -0.35% | 6.79% | 3.73% |
| *Peer Group Average* | 4.77% | 6.01% | 7.57% | 1.14% | 8.24% | 5.07% |
| Causeway International Value I (CIVIX) | 3.91% | 5.65% | 7.40% | 0.94% | 10.39% | 7.19% |
| Columbia Overseas Value Inst3 (COSYX) | 7.15% | 6.22% | 8.17% | 1.36% | 8.28% | 4.96% |
| Transamerica International Equity R6 (TAINX) | 5.09% | 6.14% | 8.67% | 1.21% | 7.95% | 4.61% |

| Fund | 2019 10-Year Return | 2020 10-Year Return | 2021 10-Year Return | 2022 10-Year Return | 2023 10-Year Return | 2024 10-Year Return |
|------|------|------|------|------|------|------|
| **Templeton Foreign R6 (FTFGX)** | 4.29% | 3.43% | 5.41% | 3.30% | 2.71% | 3.60% |
| *Peer Group Average* | 5.86% | 5.08% | 7.52% | 4.63% | 4.07% | 4.91% |

---

[22] Methodology further explained in para. 61, *supra*.

| | | | | | | |
|---|---|---|---|---|---|---|
| Causeway International Value I (CIVIX) | 5.84% | 5.17% | 7.28% | 4.22% | 4.48% | 5.54% |
| Columbia Overseas Value Inst3 (COSYX) | 5.99% | 5.50% | 7.78% | 5.39% | 4.78% | 6.05% |
| Transamerica International Equity R6 (TAINX) | 6.67% | 6.13% | 8.43% | 4.75% | 3.96% | 4.85% |

81.     These are relevant comparators with similar objectives. All four funds have the same sole investment goal: long-term performance.[23] All four funds invest at least 80% of their assets in non-United States equity securities (e.g. stocks). None of the funds contain restrictions on which countries or regions they will invest in. All four funds utilize a value investing strategy. And all of the funds invest in small, medium, and large companies. These individual peer funds provide an additional meaningful benchmark by which to judge the Templeton Foreign Fund.

82.     Beyond observed underperformance, the Templeton Foreign Fund fails to deliver performance on a risk-adjusted basis. Comparing that fund's alpha against its market peers, as calculated against the MSCI All Country World Index ex USA, shows that the Templeton Foreign Fund's underperformance was caused by its managers' lack of skill. The Templeton fund showed negative alpha every single year of the Class Period on rolling 5- and 10-year bases, indicating that its managers persistently made worse decisions than simply investing in the same underlying holdings as the MSCI index. The Templeton Foreign Fund's alpha underperformed its peer funds every year of the Class Period on 10-year basis, and every year except one on a 5-year basis (when it was the second-worst fund).

*Calculation Benchmark: MSCI ACWI Ex USA NR USD*

| Fund | 2019 5-Year Alpha | 2020 5-Year Alpha | 2021 5-Year Alpha | 2022 5-Year Alpha | 2023 5-Year Alpha | 2024 5-Year Alpha |
|---|---|---|---|---|---|---|
| **Templeton Foreign R6 (FTFGX)** | -2.05% | -4.11% | -5.96% | -0.83% | -0.39% | -0.09% |
| Causeway International Value I (CIVIX) | -1.27% | -4.38% | -3.99% | 0.98% | 2.77% | 3.39% |
| Columbia Overseas Value Inst3 (COSYX) | 1.83% | -3.35% | -2.50% | 0.98% | 1.14% | 1.17% |

---

[23] "Long-term capital growth," (Templeton); "long-term growth of capital and income," (Causeway); "long-term capital appreciation," (Columbia); and "long-term total return," (Transamerica).

- 29 -

| Transamerica International Equity R6 (TAINX) | -0.24% | -3.07% | -1.55% | 0.67% | 0.62% | 0.63% |

*Calculation Benchmark: MSCI ACWI Ex USA NR USD*

| Fund | 2019 10-Year Alpha | 2020 10-Year Alpha | 2021 10-Year Alpha | 2022 10-Year Alpha | 2023 10-Year Alpha | 2024 10-Year Alpha |
|------|------|------|------|------|------|------|
| **Templeton Foreign R6 (FTFGX)** | -0.74% | -1.51% | -2.01% | -0.46% | -1.03% | -1.14% |
| Causeway International Value I (CIVIX) | 0.88% | 0.07% | -0.53% | 0.43% | 0.74% | 0.74% |
| Columbia Overseas Value Inst3 (COSYX) | 1.12% | 0.58% | 0.22% | 1.59% | 1.08% | 1.35% |
| Transamerica International Equity R6 (TAINX) | 1.82% | 1.22% | 1.00% | 0.89% | 0.15% | 0.04% |

83.    The fiduciaries of comparable retirement plans clearly responded to the Templeton Foreign Fund's poor performance and subpar management. The Templeton Foreign Fund was used in just 3 other non-government, ERISA-covered defined contribution plan with over $500 million in assets. Meanwhile, some of the Franklin Growth Fund's largest competitors were used by 6 times more of those plans.

| Fund | # of non-Franklin Plans | Utilization Rate |
|------|------|------|
| **Templeton Foreign R6 (FTFGX)** | 3 | 0.1% |
| Causeway International Value I (CIVIX) | 17 | 0.7% |
| Columbia Overseas Value Inst3 (COSYX) | 6 | 0.3% |
| Transamerica International Equity R6 (TAINX) | 18 | 0.8% |

84.    The Templeton Foreign Fund has remained in the Plan throughout the Class Period. Given this chronic underperformance on both absolute and risk-adjusted bases, a loyal and prudent fiduciary would have removed the Templeton Foreign Fund from the Plan. Defendants' failure to do so supports an inference that their process for monitoring the Plan's investments was disloyal and imprudent.

85.    Given their high costs, poor performance, and limited use among other similarly sized plans' fiduciaries, Defendants' decision to retain the Franklin Funds in the Plan was disloyal and imprudent. At any time, Defendants could have selected cheaper, better-performing non-

- 30 -

proprietary options for the Plan. Instead, Defendants prioritized Franklin's business interests and profits over the Plan's participants, retaining proprietary funds that returned profits to Franklin at participants' expense. Defendants' choice to offer participants an investment menu where the Franklin Funds dominated the Plan cannot be reconciled with their duty to act with "an eye single" to participants' interests. *Pegram*, 530 U.S. at 235 (quotation omitted). Defendants' retention of the Franklin Funds under these circumstances shows that Defendants have breached their fiduciary duties.

> **D.    Defendants' settlement of a previous lawsuit did not remedy the imprudent and disloyal management of the Plan, with Defendants adding even more proprietary funds since.**

86.    This is not the first time Defendants have been sued over their disloyal, imprudent management of the Plan. Unfortunately for the Plan's participants, that previous litigation failed to fundamentally change Defendants' disloyal and imprudent management of the Plan.

87.    In 2016, a Plan participant filed a complaint against Defendants alleging that "Defendants caused the Plan to invest nearly a billion of dollars in imprudent investment options, many of which were more expensive than prudent alternatives, unlikely to outperform their benchmarks, and laden with excessive fees which were paid to Franklin Templeton and its subsidiaries." Compl. at 20, *Cryer v. Franklin Res., Inc.*, No. 16-CV-04265 (N.D. Cal. July 28, 2016). That plaintiff also alleged that "Defendants failed to remove the funds even though a prudent fiduciary would have done so given the high fees, poor performance prospects, and availability of lower-cost alternatives." *Id.* The focus of these allegations were "forty mutual funds . . . managed by Franklin Templeton or its subsidiaries," which constituted the entire mutual fund lineup offered by the Plan. *Id.* at 5.

88.    The plaintiff in that case alleged that these actions violated ERISA's duties of prudence and loyalty. *Id.* at 20.[24] In 2019, Defendants settled that matter by agreeing to (1) make $13.85 million in direct payments to former participants in the plan, (2) increase Franklin's

---

[24] The *Cryer* case was eventually consolidated with another ERISA class action filed against Defendants, which alleged "a nearly identical claim of a breach of fiduciary duty" and added failure to monitor and prohibited transaction claims. *See Cryer*, 2018 WL 6267856, at *1 n.1.

matching contributions for current participants, estimated at $12.9 million in value,[25] and (3) add a nonproprietary TDF suite to the Plan and maintain it in the lineup for a three year "compliance period." Pls.' Unopposed Mot. Prelim. Approval Class Action Settlement Ex A. at 2, 6, 9–10, 13–14, *Cryer*, No. 16-CV-04265 (N.D. Cal. Feb. 15, 2019) (ECF No. 156-1) [hereinafter "*Franklin 2019 Settlement*"].

89.     From 2020 through 2022, the Plan's lineup remained largely the same, containing between 25 and 27 funds, with Franklin Funds constituting 76% to 77% of the investment options. Only two funds were removed from the Plan, and none were added. Over this time, Defendants left some of their worst-performing options in the Plan, including the Franklin Growth Fund, Franklin Income Fund, and Templeton Foreign Fund.

90.     Then in 2023, once the 2019 settlement's three-year compliance period was complete, Defendants continued where they left off prior to the *Cryer* lawsuit. They added ten Franklin Funds to the Plan, including seven from newly acquired affiliate companies previously owned by Legg Mason.[26]

91.     Many of these newly added funds were duplicative of funds already in the lineup or added at the same time, sharing the same Morningstar categories or fund objectives. These additions created a needlessly redundant investment lineup. At the end of 2023, the Plan contained 11 bond funds and 14 large cap stock funds out of 35 total investment options.

| Proprietary Funds Added in 2023 | Morningstar Category | Similar Funds[27] |
|---|---|---|
| BrandywineGlobal Corporate Credit Fund | US Fund High Yield Bond | 3 |
| BrandywineGlobal Global Opportunities Fund | US Fund Global Bond | 3 |

[25] Pls.' Mem. Law Supp. Mot. Prelim. Approval Settlement at 5, *Cryer*, No. 16-CV-04265 (N.D. Cal. Feb. 15, 2019) (ECF No. 157).
[26] Franklin acquired Legg Mason, Inc., a Baltimore-based investment company, in 2020. Among Legg Mason's subsidiary companies, termed "affiliates," were Brandywine Global, ClearBridge Investments, and Western Asset Management Company, which all had funds placed in the Plan.
[27] Certain nonproprietary funds added to the Plan in 2023 do not have formal Morningstar Categories because Morningstar does not cover CITs. To categorize those funds, Plaintiffs use either the Morningstar Category of a mutual fund version of the same investment strategy or an analysis of the fund's fact sheet and prospectus.

- 32 -

| | | |
|---|---|---|
| ClearBridge Dividend Strategy Fund | US Fund Large Value | 3 |
| ClearBridge Large Cap Growth Fund | US Fund Large Growth | 4 |
| ClearBridge Sustainability Leaders Fund | US Fund Large Blend | 2 |
| Franklin DynaTech Fund | US Fund Large Growth | 4 |
| Franklin High Income Fund | US Fund High Yield Bond | 3 |
| Franklin Mutual Beacon Fund | US Fund Global Large-Stock Value | 1 |
| Western Asset Core Bond Fund | US Fund Intermediate Core Bond | 1 |
| Western Asset Core Plus Bond Fund | US Fund Intermed. Core-Plus Bond | 2 |

92.     These newly added Franklin Funds were not superior options for the Plan. In fact, they were average of 93% more expensive than the average expense ratio for funds within the same asset class category among plans with over $1 billion in assets,[28] and an average of 19% more expensive than leading actively managed funds.[29]

| Proprietary Fund[30] | ICI - BrightScope Category / Morningstar Category | Fund Net Exp. Ratio 2022 | Avg. 401(k) Fund Exp. Ratio 2022[31] | % Fee Excess Over 401(k) Avg. | Avg. Actively Managed Exp. Ratio 2022[32] | % Fee Excess Over Actively Managed Avg. |
|---|---|---|---|---|---|---|
| BrandywineGlobal Corporate Credit IS | Domestic Bond / US Fund High Yield Bond | 0.49% | 0.24% | 104% | 0.56% | -13% |
| BrandywineGlobal GlobalOpportunities Bond IS | International Bond / US Fund Global Bond | 0.56% | 0.48% | 17% | 0.56% | 0% |
| ClearBridge Dividend Strategy IS | Domestic Equity / US Fund Large Value | 0.66% | 0.31% | 113% | 0.47% | 40% |
| ClearBridge Large Cap Growth IS | Domestic Equity / US Fund Large | 0.63% | 0.31% | 103% | 0.52% | 21% |

[28] Using the same methodology discussed in note 31, *infra*.

[29] Using the same methodology discussed in note 32, *infra*.

[30] *See* Ex. A.

[31] The average 401(k) fund expense ratio is drawn from BrightScope/ICI average expense ratios for funds in the correlated investment objective category. INVESTMENT COMPANY INSTITUTE, *supra* note 3, at 54. The funds were assigned to BrightScope categories based on a comparison to their Morningstar categories.

[32] The "Actively Managed Average Expense Ratio" consists of the average annual report expense ratio of the least expensive share class of the twenty largest actively managed mutual funds, by assets under management, managed in a similar investment style to each proprietary fund, as represented by the Morningstar Category.

| Proprietary Fund[30] | ICI - BrightScope Category / Morningstar Category | Fund Net Exp. Ratio 2022 | Avg. 401(k) Fund Exp. Ratio 2022[31] | % Fee Excess Over 401(k) Avg. | Avg. Actively Managed Exp. Ratio 2022[32] | % Fee Excess Over Actively Managed Avg. |
|---|---|---|---|---|---|---|
| | Growth | | | | | |
| ClearBridge Sustainability Leaders IS | Domestic Equity / US Fund Large Blend | 0.75% | 0.31% | 142% | 0.36% | 108% |
| Franklin DynaTech R6 | Domestic Equity / US Fund Large Growth | 0.45% | 0.31% | 45% | 0.52% | -13% |
| Franklin High Income R6 | Domestic Bond /US Fund High Yield Bond | 0.50% | 0.24% | 108% | 0.56% | -11% |
| Franklin Mutual Beacon R6 | Domestic Equity / US Fund Global Large-Stock Value | 0.70% | 0.31% | 126% | 0.72% | -3% |
| Western Asset Core Bond I | Domestic Bond / US Fund Intermediate Core Bond | 0.45% | 0.24% | 88% | 0.32% | 41% |
| Western Asset Core Plus Bond I | Domestic Bond / US Fund Intermediate Core-Plus Bond | 0.45% | 0.24% | 88% | 0.38% | 18% |

93.     The investment market did not think highly of these funds either. Over the course of the Class Period, the ten funds added to the Plan in 2023 saw net outflows of $40.3 billion in assets under management.

94.     In the same year, 2023, Franklin amended its Plan to require that certain proprietary funds be included in the Plan as investment options to Participants. The amendment expressly listed twenty-one different funds by name, all managed by Franklin or its affiliates, that must be offered to Participants in the Plan (the "Flagship Funds"). The list included the Franklin Income Fund, the Franklin Growth Fund, the Templeton Foreign Fund, and all ten of the proprietary funds that were newly added in 2023.

95.     The Plan amendment also provided that an independent fiduciary shall be appointed by Franklin to exercise exclusive responsibility to monitor the performance and other characteristics of the Flagship Funds. Under the Plan's terms, that fiduciary was expressly given the authority to determine whether, and to what extent, the Flagship Funds may remain investment options in the Plan pursuant to Section 4.09 of the Plan and consistent with requirements of ERISA.

96.     Prior to the 2023 Plan amendment, Callan Associates, Inc. ("Callan") had served as a 3(21) investment advisor to the Investment Committee with respect to the Plan lineup, and Gallagher served as a discretionary 3(38) fiduciary with respect to Company stock offered in the Plan. ECF No. 37, at 3.

97.     Based on representations made by Defendants in filings with this Court, Franklin appointed Gallagher to be the independent fiduciary responsible for the proprietary Flagship Funds. *Id.* at 4. Callan was named the independent fiduciary responsible for curating a menu of unaffiliated non-proprietary funds. *Id.* at 5.

98.     As the independent fiduciary responsible for the proprietary Flagship Funds, Gallagher had an affirmative duty to remove the underperforming funds and override the Plan's requirement that those underperforming funds be included. Importantly, Gallagher was expressly granted authority in the Plan "to determine whether, and to what extent, the Flagship Funds may remain investment options in the Plan pursuant to this Section 4.09 consistent with the requirements of ERISA..." However, Franklin represented in filings to this Court that Gallagher determined that the funds could be maintained in the lineup and did not remove any of the Flagship Funds. *Id.* at 7. Plaintiffs do not have access to the analysis supporting this determination, assuming any such analysis was performed. Plaintiffs also do not have access to information regarding the agreement between Gallagher and Franklin, including details on how Gallagher could remove from the lineup any of the Flagship Funds that are expressly required by the 2023 Plan amendment, or whether a new Plan amendment or other process by Franklin would be required to do so. Nevertheless, based on the analysis presented herein, it is reasonable to infer

that Gallagher failed to prudently evaluate the appropriateness of the Flagship Funds and that Gallagher disloyally placed Franklin's interests ahead of the interests of the Plan and its participants.

99.    In 2024, Defendants celebrated their recent acquisition of Putnam Investments, a Boston-based investment company, by adding the Putnam Stable Value Fund to the Plan, despite already having a non-proprietary stable value fund in the lineup.

100.    By 2024, the Plan contained more proprietary investments than at the time of the settlement of the first lawsuit. And the Plan continued to retain some of its worst-performing proprietary options. Rather than meaningfully monitor and remove subpar Franklin Funds, it merely diluted the Plan by adding duplicative nonproprietary options, increasing the Plan's menu from 25 to 36 funds. This "Noah's Ark" two-by-two (or three or four) pairing of funds does not relieve Defendants of their duty to conduct an independent evaluation of each investment option in the Plan and remove the unsuitable funds. *See Hughes*, 595 U.S. at 176.

101.    As an example, after Defendants' additions to the Plan in 2023, the lineup contained four funds categorized by Morningstar as Large Growth, meaning that they invest in companies which "are in the top 70% of the capitalization of the US equity market and are typically projected to grow faster than other large-cap stocks." *Large Growth*, MORNINGSTAR, https://www.morningstar.com/stock-styles/large-growth (last visited July 8, 2025). As discussed above, *supra* note 6, an oversized plan lineup is detrimental to participants and reduces overall savings. But Defendants stocked the Plan with four Large Growth funds, three of which were proprietary, [33] even though those funds share an investment style and have highly similar goals and investment strategies. Their sole investment objectives are essentiality identical either "capital appreciation" or "capital growth." And they generally invest 75% to 80% of their assets in large growth equities (e.g. stocks).

102.    But despite this overlap in style, the four Large Growth funds did not perform the same. There were two clear winners in 2023, when three of the four Large Growth funds were

---

[33] The ClearBridge Large Cap Growth, Franklin DynaTech, and Franklin Growth Funds.

added to the Plan. On both 5- and 10-year rolling bases, the Franklin DynaTech Fund was either the best or second-best Large Growth Fund in the Plan while simultaneously being the second cheapest of the four. And the only non-proprietary Large Growth option in the Plan, the T. Rowe Price Large Cap Growth Fund, was the best or second-best Large Growth fund every year on a 10-year basis, and every year but one on a 5-year basis. Those facts hold true when accounting for fund expenses. Notably, the proprietary ClearBridge Large Cap Growth cost the most out of all four options and was never the best or second-best performer in any year. There was no apparent reason for the Clearbridge fund to be added the Plan, in 2023, when it never outperformed any of the other three Large Growth funds and cost more than all of them. Similarly, the proprietary Franklin Growth Fund was outclassed by the Franklin Dynatech and T. Rowe Funds in all but one year, making it essentially useless to retain in the Plan at that time.

| Large Growth Fund | Expense Ratio | 2019 5-Year Return | 2020 5-Year Return | 2021 5-Year Return | 2022 5-Year Return | 2023 5-Year Return | 2024 5-Year Return |
|---|---|---|---|---|---|---|---|
| ClearBridge Large Cap Growth IS (LSITX) | 0.64% | 14.30% | 18.52% | 21.62% | 7.35% | 15.67% | 14.94% |
| Franklin DynaTech R6 (FDTRX) | 0.45% | 16.95% | 26.02% | 28.69% | 8.62% | 16.26% | 15.25% |
| Franklin Growth R6 (FIFRX) | 0.39% | 12.78% | 18.50% | 21.27% | 9.14% | 15.39% | 12.77% |
| T. Rowe Price Lrg Cp Gr I (TRLGX) | 0.55% | 15.90% | 21.54% | 26.00% | 8.35% | 15.92% | 16.37% |

| Large Growth Fund | Expense Ratio | 2019 10-Year Return | 2020 10-Year Return | 2021 10-Year Return | 2022 10-Year Return | 2023 10-Year Return | 2024 10-Year Return |
|---|---|---|---|---|---|---|---|
| ClearBridge Large Cap Growth IS (LSITX) | 0.64% | 14.69% | 16.85% | 19.39% | 12.66% | 13.26% | 14.62% |
| Franklin DynaTech R6 (FDTRX) | 0.45% | 15.97% | 19.37% | 21.13% | 13.45% | 13.84% | 16.10% |
| Franklin Growth R6 (FIFRX) | 0.39% | 13.63% | 15.14% | 17.40% | 12.64% | 12.50% | 12.77% |
| T. Rowe Price Lrg Cp Gr I (TRLGX) | 0.55% | 16.04% | 18.18% | 20.84% | 13.85% | 13.99% | 16.14% |

103.    This inclusion of superfluous proprietary funds is not an isolated occurrence. After Defendants' 2023 additions, the Plan's lineup contained three funds categorized by Morningstar as Large Value, meaning that they invest in companies which "are in the top 70% of the capitalization of the US equity market and are typically less expensive or growing more slowly than other large-cap stocks." *Large Value*, Morningstar, https://www.morningstar.com/stock-styles/large-value (last visited July 8, 2025). Two of these three funds were proprietary.[34] Defendants included three Large Value funds in the Plan even though those funds share an investment style and have highly similar goals and investment strategies. All three funds seek current income and long-term capital appreciation with an emphasis on dividend income: "seeks dividend income, growth of dividend income and long-term capital appreciation," (Clearbridge); "emphasizing high current income and long-term capital appreciation," specifically via "substantially dividend paying" stocks, (Franklin); and "above-average level of current income and reasonable long-term capital appreciation," specifically via stocks that "typically pay above-average levels of dividend income,"(Vanguard). All three funds invest at least 80% of net assets in equities (e.g. stocks).

104.    Again, this duplicative group of funds had a clear loser in 2023. The proprietary Franklin Equity Income Fund was the worst performer of the three Large Value funds leading up to 2023 on a 10-year rolling basis. It was never the best performer on a 5-year basis. And when accounting for the fact that the Franklin fund charged 2.8 times the fees of the Vanguard fund, the Franklin Equity Income Fund was the last place performer in all but one year leading up to 2023 on a 5-year basis and every year on a 10-year basis. Meanwhile, the ClearBridge Dividend Strategy Fund was the best performer every year on a 5-year basis and the best or second best every year on a 10-year basis. There was no apparent reason for the Franklin Equity Income Fund to be added to the Plan.

---

[34] The ClearBridge Dividend Strategy and Franklin Equity Income Funds.

| Large Value Fund | Expense Ratio | 2019 5-Year Return | 2020 5-Year Return | 2021 5-Year Return | 2022 5-Year Return | 2023 5-Year Return | 2024 5-Year Return |
|---|---|---|---|---|---|---|---|
| ClearBridge Dividend Strategy IS | 0.66% | 10.58% | 13.29% | 15.44% | 9.52% | 13.63% | 11.05% |
| Franklin Equity Income R6 | 0.49% | 9.36% | 10.77% | 13.30% | 8.44% | 11.38% | 10.03% |
| Vanguard Equity-Income Adm | 0.18% | 10.17% | 10.66% | 12.67% | 8.91% | 11.85% | 9.97% |

| Large Value Fund | Expense Ratio | 2019 10-Year Return | 2020 10-Year Return | 2021 10-Year Return | 2022 10-Year Return | 2023 10-Year Return | 2024 10-Year Return |
|---|---|---|---|---|---|---|---|
| ClearBridge Dividend Strategy IS | 0.66% | 12.39% | 11.96% | 13.87% | 11.50% | 10.44% | 10.82% |
| Franklin Equity Income R6 | 0.49% | 11.30% | 10.32% | 12.70% | 10.70% | 8.84% | 9.70% |
| Vanguard Equity-Income Adm | 0.18% | 13.02% | 11.80% | 13.23% | 11.79% | 9.70% | 10.07% |

105. Rather, Defendants' addition of funds from both its newly acquired companies and existing stable of funds—despite their duplicative nature, high fees, and poor performances—is further evidence of their disloyal and imprudent preference for Franklin's proprietary funds. Had Defendants conducted a prudent fund selection process for the Plan, by conducting prudent review of the Plan's investments and prudent evaluation of potential additions, using a process that was not polluted by self-interest and disloyalty, Defendants would not have selected all of these 10 funds for addition to the Plan, and would have removed underperforming options already in the Plan.

## II. PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES

106. Until shortly before this suit was filed, Plaintiffs did not have knowledge of all the material facts (including, among other things, the investment menus of similarly sized plans, the availability of less expensive and better performing investment alternatives, and, the costs of the

Plan's investments compared to those in similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

107.    Plaintiffs seek certification of this action as a class action under Federal Rule of Civil Procedure 23 and ERISA's derivative action provisions, 29 U.S.C. §§ 1109 and 1132(a)(2).[35]

108.    Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows (hereinafter "the Class"):[36]

> All participants and beneficiaries of the Franklin Templeton 401(k) Retirement Plan that were invested in invested in funds managed by Franklin and its affiliates at any time on or after July 22, 2019, excluding any persons with responsibility for the Plan's investment or administrative functions.

109.    Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 5,300 to 6,200 participants at all relevant times during the applicable period, many of whom were invested in the Franklin Funds.

110.    Typicality:    Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs participated in the Plan during the class period and suffered financial harm because of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs

---

[35] 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a).

[36] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

1    consistently with other Class members with regard to the Plan. Defendants' disloyal and

2    imprudent decisions affected all Plan participants similarly.

3        111.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class.

4    Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have

5    retained counsel experienced in complex class action litigation, including ERISA breach of

6    fiduciary duty litigation. Plaintiffs do not have any conflicts of interest with any Class members

7    that would impair or impede their ability to represent such Class members.

8        112.    Commonality: Common legal and factual questions exist as to all Class members

9    and predominate over any questions solely affecting individual members, including but not

10   limited to:

11            a.    Whether Defendants are fiduciaries with respect to the Plan;

12            b.    Whether Defendants breached their fiduciary duties of loyalty and

13                prudence by engaging in the conduct described herein;

14            c.    Whether Defendants breached their duty to monitor other Plan fiduciaries;

15            d.    The proper form of equitable and injunctive relief; and

16            e.    The proper measure of monetary relief.

17       113.    Class certification is appropriate under Federal Rule of Civil Procedure

18   23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of

19   inconsistent or varying adjudications with respect to individual Class members that would

20   establish incompatible standards of conduct for Defendants.

21       114.    Class certification is also appropriate under Federal Rule of Civil Procedure

22   23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter,

23   would be dispositive of the interests of the other persons not parties to the individual

24   adjudications or would substantially impair or impede their ability to protect their interests. Any

25   award of prospective equitable relief by the Court would be dispositive of non-party participants'

26   interests. The accounting and restoration of the Plan's property that would be required under 29

27   U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

28

Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members and a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will remove the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will likely not present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I

### Breach of Fiduciary Duties (against all Defendants)
### 29 U.S.C. § 1104(a)(1)(A)–(B)

115.    As alleged above, all Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

116.    29 U.S.C. § 1104 imposes fiduciary duties of loyalty and prudence upon Defendants in connection with their administration of the Plan and their selection and monitoring of the Plan's investments.

117.    Defendants breached these fiduciary duties by engaging in the conduct described herein. Among other things, Defendants failed to employ a loyal and prudent process for selecting, monitoring, and reviewing the Franklin Funds. Defendants employed an improper and unjustified preference for the Franklin Funds over superior-performing, less-expensive investments available to the Plan. And Defendants failed to control the Plan's administrative costs.

118.    Instead of acting in the best interests of the Plan's participants, Defendants' conduct was motivated by a desire to drive assets under management, revenues, and profits to Franklin, as well as to promote Franklin's business interests. Accordingly, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

119.    Further, each of the actions and omissions described in paragraphs 117-118 above, and elsewhere in this Complaint, show that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

120.    Each Defendant performing investment and administrative duties knowingly participated in the breaches of the other Defendants performing such duties, knowing that other Defendants were breaching their fiduciary duties, and enabling commission of these breaches by failing to lawfully discharge their own fiduciary duties or make any reasonable effort under the circumstances to remedy other Defendants' breaches. For these reasons, Defendants are also liable as co-fiduciaries under 29 U.S.C. § 1105.

121.    Because of Defendants' fiduciary breaches, the Plan and its participants suffered millions of dollars in losses throughout the putative class period. Defendants are liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan all losses resulting from these fiduciary breaches, and to restore to the Plan any profits that Defendants captured through the use of Plan assets or that resulted from such fiduciary breaches. In addition, Defendants are liable for additional equitable relief and other relief as provided by ERISA and other applicable law.

## COUNT II

### Failure to Monitor Fiduciaries (against Franklin)

- 43 -

122.    As alleged throughout the Complaint, Franklin is a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A). Because it has overall oversight responsibility for the Plan and the specific responsibility to appoint and remove members of the committees, and to appoint and remove the independent fiduciary, Franklin, through its Board of Directors, has a fiduciary responsibility to monitor the performance of the committees, their members, and the independent fiduciary, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Johnson v. Couturier*, 572 F.3d 1067, 1076 (9th Cir. 2009) ("[W]here members of an employer's board of directors have responsibility for the appointment and removal of ERISA trustees, those directors are themselves subject to ERISA fiduciary duties, albeit only with respect to trustee selection and retention." (citation omitted)); *Solis v. Webb*, 931 F. Supp. 2d 936, 953 (N.D. Cal. 2012) ("Implicit within the duty to select and retain fiduciaries is a duty to monitor their performance." (citation omitted)).

123.    Given that Franklin had overall administrative responsibility for the plan, and was also directly responsible for hiring Gallagher as the Plan's independent fiduciary, Franklin had a fiduciary duty to select and monitor the Plan's consultants and other service providers, and ensure that fees paid to such service providers are prudent and reasonable.

124.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

125.    To the extent that Franklin's fiduciary monitoring responsibilities were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

126.    Franklin breached its fiduciary monitoring duties by, among other things:

  a.    Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a

- 44 -

result of the appointees disloyal and imprudent actions and omissions with respect to the Plan;

    b.   Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

    c.   Failing to remove appointees whose performance was inadequate in that they continued to maintain disloyally and imprudently selected and retained, excessively costly, and poorly performing proprietary investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

127.    Because of Franklin's breach of the duty to monitor, the Plan suffered millions of dollars in losses due to excessive fees and investment underperformance.

128.    Under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Franklin is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor its appointees, including both committees and the independent fiduciary, and to restore to the Plan any profits that it captured through the use of Plan assets or which resulted from its failure to properly monitor the committees and the independent fiduciary. In addition, Franklin is liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Edmund Ang, Shayna DeMedici, and Carlyn Gaver individually and as representatives of the Class Defined above, and on behalf of the Plan, request the following relief:

**A.**    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(1)(B) or Rule 23(b)(3), of the Federal Rules of Civil Procedure;

**B.**    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

**C.**    A declaration that Defendants breached their fiduciary duties under ERISA;

**D.**    An order compelling Defendants to personally make good to the Plan all losses

1      that the Plan incurred as a result of the breaches of fiduciary duties described

2      herein, and to restore the Plan to the position it would have been in but for this

3      unlawful conduct;

4      **E.**    An accounting for profits earned by Franklin, and a subsequent order requiring

5      Franklin to disgorge all profits received from, or in respect of, the Plan;

6      **F.**    An order granting equitable restitution and other appropriate equitable monetary

7      relief against Defendants including, but not limited to, imposition of a constructive

8      trust on all assets of the Plan transferred to Franklin as a result of Defendants'

9      unlawful conduct in violation of ERISA, or a surcharge against Franklin to prevent

10     unjust enrichment from unlawful conduct involving the Plan;

11     **G.**    An order enjoining Defendants from any further violations of ERISA;

12     **H.**    An order requiring replacement or removal of certain investments in the Plan;

13     **I.**    An order requiring removal of the Plan's fiduciaries and replacement with an

14     independent fiduciary;

15     **J.**    Other equitable relief to redress Defendants' illegal practices and to enforce

16     ERISA as may be appropriate;

17     **K.**    An award of pre-judgment interest;

18     **L.**    An award of attorneys' fees and costs under 29 U.S.C. § 1132(g) and/or the

19     common fund doctrine; and

20     **M.**    An award of such other and further relief as the Court deems equitable and just.

21     <u>**DEMAND FOR JURY TRIAL**</u>

22     Under U.S. Const. amend. VII, and Fed. R. Civ. P. 38(b), Plaintiffs Edmund Ang, Shayna

23     DeMedici, and Carlyn Gaver hereby demand a jury trial as to Counts One (alleging breaches of

24     fiduciary duty) and Two (alleging failure to monitor) of the Complaint with respect to all issues

25     other than equitable relief.

26     Should the Court determine that Plaintiff has no right to a jury trial, Plaintiff alternatively

27     requests that the Court empanel an advisory jury pursuant to Fed. R. Civ. P. 39(c)(1). *See Moitoso*

28

*v. FMR LLC*, 410 F. Supp. 3d 320, 332 (D. Mass. 2019) (empaneling an advisory jury in an ERISA breach of fiduciary duty case).

Dated: November 10, 2025

**NICHOLS KASTER, LLP**
**NICHOLS KASTER, PLLP**
**STEPHAN ZOURAS, LLC**
**DON BIVENS, PLLP**

By: *s/ Brock J. Specht*
        Brock J. Specht

ATTORNEYS FOR PLAINTIFFS AND THE
PROPOSED CLASS

- 47 -